Thank you, Your Honor. May it please the Court, I am Rob Schmieder and I have the honor of representing Teddy and Melanie Scott in this matter. The trial court erred below by entering summary judgment against the Scotts on the issue of foreseeability. In addition, we've also pointed out that the trial court abused its discretion by removing the automatic Rule 37 sanctions for Dyno Nobel's conduct in hiding two things. Number one, startup data and a shutdown checklist that were issued. We ask this Court to reverse the judgment of the trial court and remand this matter for further proceedings. On March 20, 2015, in Louisiana, Missouri, Dyno Nobel initiated a startup of its nitric acid plant. Now, in its nitric acid plant, Dyno Nobel creates intentionally nitrogen dioxide that it then pushes through and mixes with water to create nitric acid. The nitrogen dioxide that is not captured by that water is then vented through a stack. During the startup, and these are all undisputed facts, the amount of nitrogen dioxide that's emitted is excessive. It exceeds even their grandfathered in provision of over 40 percent opacity. That day, at 3 o'clock approximately a.m., they initiated the startup when no one was around at the neighboring plant at Calumet, where Teddy and his construction crew were working. They ran into a problem at around 5, 5.30. They initiated a shutdown. They then fixed the equipment and without warning, without waiting until after hours, which was their custom and routine practice, they initiated another startup. But there was one also significant point that happened here. They didn't, during that shutdown, purge... You're arguing the negligence case. That's not what's before us on appeal. Well, no, I'm... Whether it was negligent operation is not the issue. But those negligent... The question is one of law. Did they have a duty? But the question of law deals with foreseeability, which are based upon the facts and circumstances at issue. As this court said in Brown v. Davis back in 2016, when you negligently perform an act, it's foreseeable that injury will result. In that case, the defendant didn't block off all access points to... That's the proximate cause. To use the Lopez dichotomy in the Supreme Court of Missouri, we're talking about the predictive form of foreseeability, not proximate cause foreseeability, which is hindsight, as I understand the Supreme Court of Missouri's opinion. I understand the distinction, but that... Well, it's the Missouri law distinction, I believe. Well, no, no. That's the controlling case, isn't it? I'm sorry? Isn't Lopez? What was it, 2011, 12? Lopez is one of the cases in a series of cases by the Missouri Supreme Court that said the test for foreseeability is whether, under the circumstances, a reasonably prudent person, knowing of that risk, would take measures to guard against it or protect against it. That's the test. And here, we have evidence of foreseeability. That doesn't look to what happened on the day in question. Well, the Missouri courts have said that over and over again. They do look at that. I mean, I can give you, for example, the Hosto versus Union Electric case, which specific... What year was it? I mean, the Supreme Court in Lopez says our cases aren't very clear on this, and proceeds to spend considerable time laying out... A year later, Your Honor, in Hosto versus Union Electric. Did it cite Lopez? It did. It performed to follow Lopez. It absolutely did, because it was also a helicopter crash into lines over the Mississippi River. And in that case, the court specifically said that, based upon those unique facts and those circumstances, those facts led to this was absolutely foreseeable, that these oxidized lines over the river posed a risk to anyone who was in a plane or any aviator going up and down the Mississippi River. They also cited the fact that there were similar... But that's a specific group of plaintiffs. You just referenced people who were flying over the river. I think one of the questions here is you've got plaintiffs who are on the ground quite some distance away. So how was it reasonably foreseeable that people on the ground at, what, 1,600 feet? So that, to me, is the question. To answer that, I'll answer it in two ways. Number one, on page 11 of their argument in the brief before this court, Dino Nobel stated the following. Dino also takes steps to protect its workers and neighbors from any emissions-related risks that might include dangerous concentrations of NOx. So they've judicially admitted, in a brief to this court, that they take steps to guard against the very dangerous issue. Well, it's not necessarily the very dangerous. And I mean, this, as I understand it, the cloud allegedly moved here and then moved here and then moved back. Well, that's the defendant's position, correct. The cloud, what happened was, the cloud, you had this extra NOx in the piping system. And when they started up the second startup, without warning, they pushed that out without any water to knock that down. And what happened is it... Is it undisputed there was extra NOx that was admitted during the second startup? I don't know if it's undisputed, but...  That is the plaintiff's evidence. And the reason I can't answer that question, Your Honor, is because this goes to the very heart of the fact that they hid the startup data. We didn't have the shutdown checklist. And so we never got to depose their people on that. Go ahead and finish what you say happened with the cloud. Sure. What happened with the cloud is it came out, according to witnesses, it came out, it did not rise. It just drifted down. And it drifted down over, if you look, and I attached a somewhat of a topical graphic map and the addendum to their brief, but it drifted over to where there's a hill that it has to overcome. And there's a creek that runs on basically the east side of the site. And by the way, it's one site with two different plants on it. So it drifts down, and it comes right in there, and it just circles back right onto the Calumet plant, which is, by the way, of a lower... Its plant is on a lower elevation than Diner Nobel's. And we know that nitrogen dioxide is denser than air, and in heavy concentrations will sink and go to the ground. That's in Diner Nobel's documents and its training and all of that. But I want to really zero back in on your question, because I think it's a great one, which is, how did they know that this would impact their neighbors? I have evidentiary admissions from their employees saying they thought about it all the time. They thought about it during startup shutdown and normal operations. It was a concern of theirs. Their project management engineer, safety management engineer testified, we did a PHA, a process hazard analysis of the whole plant. And we looked at the admissions, and we said, that's a hazard. Do our neighbors know about it? Meaning Calumet? Had they been informed of it? To the point where part of their routine was supposed to be, they all thought that they had warned Calumet about it. But the undisputed evidence is that there was no warning given. So this all comes back to the issue before this court, which is, is there any evidence upon which a jury could conclude that it was reasonable to foresee that this posed a danger to nearby workers on the same site? That's not an issue of fact. Duty is not an issue of fact under Missouri law. Duty is not, but the foreseeability prong case after case after case. I can give you the Pierce case. You just cited a case, and I think I heard you say Davis, which is not in your table of authorities. I'm sorry, Brown versus Davis. Yes, no, it is in our table. I know it's in, okay. Lopez has this footnote where they say, foreseeability can be a jury issue, but duty is not. What's the daylight between the two? So perfect example. Whether a duty exists to act as a reasonably prudent person under these circumstances, the court determines. But when the court's confronted with conflicting evidence about what actually happened this day, did they comply with their procedures? Did they flub their shutdown procedures? Did they not give a warning? Is there evidence that that's industry norm to comply with the reasonable standard? That becomes a jury question of negligence where foreseeability is subsumed in that. That's why the language, when you look at any jury instruction, it always says under the same or similar circumstances, right? That's talking about foreseeability. You have to say that was this conduct proper under the same or similar circumstances? Would a reasonably prudent person act this way under the same or similar circumstances? That's the very essence of foreseeability here. But I just, I can cite you the Pierce case, Lloyd, Price, Hoovers, even this court in Brown specifically said there is ample evidence in the record for the jury to find that William should have foreseen the risks of transporting the log skidder. And you can look back at all the cases when the courts have found that there are any disputed issues of fact. Well, yeah, Brown versus Davis was Eighth Circuit. And what's this, give me a Supreme Court of Missouri case that says the foreseeability element of duty goes to the jury. So that the jury effectively decides the legal question of duty. I can, just to have that exact language, I have this language for you. There is ample evidence from which a jury could conclude it was reasonable to foresee that farm machinery would be operated in the vicinity of the wire and that the operator would not see the guy wire. That is Pierce versus Platt Clay Electric Company, 769 Southwest 2nd at 776 is the pin site for that. That's a Missouri Supreme Court 1989 case. That's the court that actually said it doesn't. That's one of the confusing precedents that Lopez was talking about clearing up on this question. Not on that question, on Pierce, but either way. Well, the evidence before this court is that they judicially admitted it, not only in page 11 of the brief here, but in response to the additional material facts in the district court below. We've cited those in our brief. The appellate record is 2264, 2265. We have evidentiary admissions. I've quoted all the language about how they thought about it. They knew this was a risk. They thought there should be warnings to calumet. There were no warnings. We have all of that evidence. And then we have all the constructive knowledge because that's one thing that is always overlooked here, which is it's not so much what the defendant, even though the defendant knew it and the defendant admits it took those steps, the constructive knowledge is very clear that they knew they had this poison. They knew there were no antidotes. They knew it was excessive. They knew they specifically didn't follow their own procedures. The procedures which, by the way, say, if you don't follow us, you're going to increase the risk or introduce new risks. So make sure you follow these procedures. On top of that, they had everything from blasting businesses. They've got a blasting business services and products where they specifically say that when you operate in proximity to neighbors, neighborhoods, townships, that knocks is of utmost concern. That's on 2052, 2053, and 2055 of the record. So when you look at all of those things, a reasonably prudent person would guard against that, especially with the dangers here. I would like to reserve a little bit of my time for rebuttal. Thank you. Thank you. Mr. Bennion. Thank you, your honors. May it please the court, David Bennion for defendant and appellee Dinah Nobel, Inc. The district court should be affirmed in this case because the district court properly applied Missouri law to the undisputed facts of this case and determined that plaintiffs did not show that the way in which Mr. Scott was allegedly injured was reasonably foreseeable to Dinah Nobel. In their briefing... Let me stop you because I had an initial reaction to this case and nothing I've read or heard has taken me off of it, but maybe you can. And that is that the duty here was established and indeed admitted by your client when it put up a 108-foot stack. Because the only reason you would do that if you're for the admission of nitrous oxide products or derivatives would be because of the risk of hurting people on the ground. If you didn't put it way up into the atmosphere. Right. And that to me ends the legal question of duty and now we get on to a very difficult or complex negligence question or case. Yes. So here's the response to that. What putting a stack does is that's an acknowledgement that NOx are dangerous, but it also takes into account science that the laws of thermodynamics, dispersion and so forth that says when you have a stack, then there is no risk or there's no foreseeability that the emissions from that stack are going to cause harm to somebody on the ground. So when they do, then it becomes a reasonableness of your client's defense to the risk it foresaw. Well, not really because if just putting up a stack or taking any other kind of safety precaution was enough to show foreseeability, then every time... Not always, but in this particular situation... It would be tantamount to saying, since we put up a stack, this is now a strict liability case because it's automatically the case that there was a duty. No, no. Of course, there are all the other actions taken too that the council has said were normally taken, but not in this case, were further attempts by your client to anticipate and ameliorate and eliminate the risk it foresaw. Well, in Missouri... It's not strict liability to determine whether A, those efforts were adequate and B, if they would have been adequate, were they adhered to. If taking safety precautions was enough to establish foreseeability, then everybody who takes safety precautions would automatically be admitting that whatever they're doing... Well, no, the plaintiff has to be within the purview of what's foreseeable, but the employees of a neighboring facility were clearly within that purview here by the very efforts your client made in the 3 a.m. startup process. That would be new law in Missouri. There's no cases that we've seen that show... This is exactly the analysis in Lopez regarding the... The next bridge over or the next lines over, but you didn't do it here. You obviously foresaw the risk. That established a duty. Well, it wasn't... And then the defendant won the case. It wasn't... In that case, it wasn't the fact that they had put balls on another location. It's that at the location where the deaths occurred, there had been other deaths from hitting the wire and there had been close calls and there was eyewitnesses who said, we saw planes flying under the wire and so forth. Okay, but duty is a preliminary question. But if... Duty should... Duty is... The law does not cut off these cases readily. If in a case like this, which is much closer to the Combshack case, where there was also a dangerous instrumentality being used, 400 degree tar, and the holes were being bored in the road, tar was pumped in, and then a stake was plugged into the hole, and then the workers were following eight to 10 stakes behind and taking the stakes out. In all the years that they'd been doing that way, nobody had ever been hurt. And in this particular case, the fellow pulled the stake out and the hot tar blew on him. The court held it was not foreseeable they're taking steps, they're working a certain distance behind, they're taking safety steps. Everyone recognizes that hot tar is dangerous and can burn you, but they're taking safety steps to avoid the problem. The fact that they're doing that... Say that again, I... It's Combshack. And in that case, the court emphasized that in all the years, doing it this way had never resulted in harm. And that's the same thing in our case. This plant has existed since the 1950s. There's startups and shutdowns 10 to 12 times per year every year during six decades. The stack height was the basis of their belief that this was not a risk to any neighbors because... That's not a controlling case. It's 60 years old Missouri Court of Appeals decision. But it's cited in Lopez and it's cited for the same proposition. And it's actually distinguishing... It distinguishes from the facts of Lopez because in Lopez, there were prior incidents that were similar. There was close calls and there had been a crash with deaths. And so in Combshack, the courts said this isn't foreseeable because it hasn't happened before in all these years. And that's the case here in Dinah-Nobel's plant. An employer with a risky operation gets one freebie. Well, it's not a risky operation, when for 60 years, in no startup has there ever been a claimed injury. In no startup... Was the startup typical of other startups? Yes. Or was this different? It was typical of other startups. There's a slight difference, which is in this startup, partway through the startup that was begun during the night before at like 3 a.m., a part failed. They had a replacement. It was a valve. They had it on site and they took that valve, put it back in place, and then continued with the startup. During business hours, so to speak. Yes, but there was nothing... There's nothing about the permit that prohibits... On your 60 years point, how do we know that sometime over 60 years at 3 a.m., with this kind of weather, the cloud didn't go to Calumet's property when nobody was around? Well, there was... In this case, there's a declaration from the plant manager that says there were other interrupted startups and they never had problems. All of the procedures when the second startup began were the same. They did things exactly the way they had been doing them for decades. They'd never had a problem before. They had no reason to believe that the emissions from the stack would do all these things that they'd never done before, which the plaintiffs claim in this case. What about counsel's suggestion that your employees admitted that they had concerns about this sort of incident, that they had concerns about neighbors, that they had... And that was judicially admitted in the brief and in depositions that... And that leads to the conclusion that, in fact, the company did foresee this sort of event. And what I would invite on that is a careful reading of the statement of additional facts because there were liberties taken. For example, you have a team of people sitting around saying... And their job is safety. And so they're brainstorming. Well, what's possible? And somebody says, well, is it possible that this could happen? And they rule it out. They say, no, the stack height, the way the wind works, the way dispersion works, that's not a problem. It's like they could say, is it... I mean, what if there was a bombing? What if an asteroid hit? They're sitting there and thinking of all kinds of contingencies, but that doesn't mean that it's foreseeable, that there's some probable basis that is sufficient to make you want to do something different. Just because someone throws out a hypothetical possibility, a mere possibility, and then they say, yeah, we don't need to worry about that. That's never happened. If that was likely to happen, if that was probable to happen, or even if it was a little bit probable, but the result would be so bad, we should do something about it. And they rule it out reasonably. Reasonably. Because it's undisputed that the hot gases that come out of that stack are much hotter than the ambient air, and hot gases rise. And that's what it's always done. It's undisputed that those gases don't descend to the ground. That's never happened. It's undisputed that those gases go in the direction that the wind is blowing, which in this case was away from the Calumet plant. And so what they're saying is, but you should have anticipated that on this day, the gas would have acted in a way that it had never acted before. On this day, the laws of thermodynamics are taking a day off. How do you know where it's gone every other time? Does someone monitor the cloud every day? People, on the days of normal operation? The 3 a.m. startups. How do you know where the cloud has gone? Does somebody track it? Well, they have windsocks that show the direction of the wind. Well, that lets them predict where it will go. Right. But as far as saying that this has never happened before, how do we really know that? If there's nobody out there at 3 a.m., we wouldn't know if it had gone to Calumet at 3 a.m., would we? Well, there's people, when they're doing a startup, the plant's lit up 24 hours a day, and there's people involved in the startup. There's workers coming and going who are involved. And the nitric acid manager is out there, and he's observing, and he testified about that, that he's in and out constantly, and he's looking, and everybody is trained to see which way the wind is blowing in case of any kind of generalized accident. It's always, if there's an accident, people need to get upwind. That's just a general safety concept. But just the concept that knocks are dangerous is not enough to make this injury in this way foreseeable. This man was working 1,600 feet away. The plaintiffs claim that the knocks came out of the stack and dropped to the ground. That science would never predict that. And history doesn't show it ever having happened before.  Then made a right-angle turn to the south, and then another right-angle turn to the west, and went to where Mr. Scott was working and got on him. These are things that science would never predict. These are things that never happened historically. And there was no reason for Dino Nobel to believe that they would happen on this day. And so the stack height, it's a given of the plant. It's not an indication that Dino thought on this day or on any day, emissions from that stack would do what they claim it did and go to a man who was 1,600 feet away and be in a concentration sufficient to cause harm. Even if the wind had been blowing straight to them, which it wasn't, it was going the other way, the air models would show that by the time it went that far, it would be so dispersed that it couldn't cause harm. It wouldn't be at a level of concentration that would be toxic. Even with the low cloud cover, doesn't that affect the dissipation? There's no evidence on the plaintiff's side how it would. They say it would, but they have no expert who's qualified in air modeling to say that. And this goes to the alternative grounds in our brief of their expert is not qualified, has never worked in a nitric acid facility, has never worked with nitric acid or NOx, has never worked with modeling, has never, is not a toxicologist. I ask her these questions in her deposition. Are you an expert in wind modeling? No. You said alternative ground. You're saying there's a Dawbert issue for us? You say that's raised on appeal? Well, we, Your Honor, in our motion for summary judgment. I don't care what you argue to the district court. Is that an issue on appeal? It is. Is there a Dawbert record? Is there a record for us to reverse the Dawbert ruling? I didn't think that was an issue here. We're not asking for any reversal. We're just saying in our motion for summary judgment, we gave an argument that they had no, they had not met the element. Don't say it's an alternate ground. That's appellate talk. Well, you're arguing alternative grounds for affirmance. Is that what you're saying? You're saying if we disagree on foreseeability, you want us to affirm on other grounds that the district court didn't allow us? Which we presented to the district court, but he didn't get to. Which would require us to make a Dawbert ruling in the first instance. Our other option is just send it back and let the district court do that first. On the motions that he withheld from ruling on, he didn't decide either way. Why wouldn't we do that? Well, you could do that if you didn't think that the judge, the district court, correctly applied the law to the undisputed facts. In this case, he did. And I would specifically reference, Your Honor, to page seven of his opinion. He outlines the controlling law. That's the argument to affirm, right? Yes. On the foreseeability. He outlines Missouri law and then he applies it to the undisputed facts. I don't see us being deciding in the first instance a Dawbert issue any more than the Rule 37 sanctions issue. Well, and I don't think you have to get there, because you affirm the judge on his correct application of the law to the undisputed facts. Of course not. The question always is for us, what if that doesn't happen? Now what do we do? And you're saying, oh, you can affirm because the expert wasn't Dawbert qualified. And it's not just that the expert wasn't Dawbert qualified. It's the actual element of standard of care and breach of standard of care and causation are not met. OK. So we're supposed to decide a negligence claim that's primarily for a jury if we decide that there was a duty. We should decide no negligence. I don't think you want to be arguing that. It's an alternative ground, but I think that the stronger argument is that we have to reach out, and now we would have to do some fact-finding in order to conclude there was no negligence. If we had first concluded that on the question of law, yes, there was a duty. It wouldn't require fact-finding in the sense of the way that a trial judge would do it. This is that there's no evidence presented. This is an absence of an element. So it's more like cellotex. You move for summary judgment on no negligence as well as no duty? Just on the specific absence of facts. At the close of all discovery? We did. This was in our motion for summary judgment. Well, all right. Thank you, Your Honors. I just perused the Lopez case, and nowhere in there, contrary to Mr. Bennion's statement, did Lopez ever cite Komaschak. Indeed, it didn't cite any Missouri Court of Appeals decision. Correct. But it did cite the Pierce case that I gave the court earlier. Yeah, but it said don't read Pierce to mean that the duty is a jury issue. In footnote one. But then it does say, in some cases, the jury may be charged with determining whether facts exist that may give rise to a finding of foreseeability. I think that's what you're asking us to say here. Well, what I'm saying is that standard is, so that makes the standard, is there any evidence from which a jury could find that it's reasonably foreseeable? That's exactly what I was trying to articulate. The other distinction about Komaschak, not that I think it's relevant, but the case, is in Komaschak, the evidence was that they followed their standard procedures. Here, we have evidence that they didn't, Dinah and Abel didn't follow its standard procedures. The other thing I'd like to address is he keeps referring to there is no evidence, or there is evidence that this has never happened before. That's simply not true. There's no evidence either way. They did submit a declaration on the history of the plant that was never disclosed during, it was produced after discovery in support of summary judgment, and all the plant manager says is, it is my understanding that there have never been any claims or reports that this has ever happened. There's no personal knowledge supporting that whatsoever. I do want to clarify one thing. I'm not asking the court to address Rule 37 for the first time. The district court denied, or actually removed, the automatic sanctions in a docket entry without any findings or comment. All I would urge the court to do is to look at the obligations. There was not only a lack of disclosure here, but there was active concealment of this throughout the case. We've attached Mr. Bennion's letter to our addendum. By August, it was very clear we were asking for the startup data and the shutdown checklist, and he said, I'm going to search for it, and then after that, we had a motion to compel where they said, we don't have it. The judge denied it as moot, and then we go through all of this discovery, our disclosed experts, the depositions of our experts, and then they disclose all of a sudden all of this data that they claim never existed, even though it was the black box data of the plant that they had since the day it happened. But didn't you get it before the discovery deadline closed, even if you didn't get it when you first asked for it? We received it somewhere around 30 days before, yes, with their expert disclosures, but discovery had already been locked in. What do you mean locked in? Locked in. We already had the fact testimony. We had already had our expert disclosures. I never got to ask a single Dynamo Bell employee about these flubbed procedures that they did on the shutdown, nor how that, and for the court to understand, the shutdown checklist has certain steps that they have to follow. Well, time is up, and we're not going to go to Rule 37 as a first instance. This isn't a first instance. No, you've argued the district court didn't do it right. We can look at that, and if we agree with you, we remand. I apologize. I misunderstood you. Thank you very much. We typically, when a court procedurally doesn't do it right, we send it back and say, please do it right. Judge, I have to say, you were my very first appellate argument 22 years ago, and so I don't, you know. I've probably gotten worse. I'm sure you have. No, I just. Did you win or lose? I won. Nice to see you. Thank you very much. Thank you both, counsel. It's been very, very thoroughly and helpfully briefed and argued, and we'll take it under advisement.